# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC.<br>40 West 20th Street, 11th Floor<br>New York, New York 10011<br><br>NATIONAL PARKS CONSERVATION ASSOCIATION<br>777 6th Street NW, Suite 700<br>Washington, D.C. 20001<br><br>THE WILDERNESS SOCIETY<br>1615 M Street NW<br>Washington, D.C. 20036<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE<br>425 East 100 South<br>Salt Lake City, Utah 84111<br><br>GRAND CANYON TRUST<br>2601 North Fort Valley Road<br>Flagstaff, Arizona 86001<br><br>GREAT OLD BROADS FOR WILDERNESS<br>605 East 7th Avenue<br>Durango, Colorado 81301<br><br>WESTERN WATERSHEDS PROJECT<br>126 S. Main Street, Suite B2<br>Hailey, Idaho 83333<br><br>SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, California 94612<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N. Main Avenue<br>Tucson, Arizona 85701 | Case No. _____ |

1

WILDEARTH GUARDIANS
516 Alto Street
Santa Fe, New Mexico 87501

DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, D.C. 20036

       *Plaintiffs*,

  v.

DONALD J. TRUMP, in his official capacity as
President of the United States
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

RYAN ZINKE, in his official capacity as Secretary of
the Interior
1849 C Street NW
Washington, D.C. 20240

BRIAN STEED, in his official capacity as the official
exercising the authority of the Director of the
Bureau of Land Management
1849 C Street NW
Washington, D.C. 20240

SONNY PERDUE, in his official capacity as
Secretary of Agriculture
1400 Independence Avenue SW
Washington, D.C. 20250

TONY TOOKE, in his official capacity as Chief of
the U.S. Forest Service
1400 Independence Avenue SW
Washington, D.C. 20250

       *Defendants*.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

# INTRODUCTION

1.      This case challenges President Donald J. Trump's unlawful
proclamation of December 4, 2017, dismantling the Bears Ears National Monument
(the Monument) and replacing it with two much smaller, noncontiguous units
covering just fifteen percent of the original Monument's area.

2.      President Barack Obama designated the Bears Ears National
Monument on December 28, 2016, to protect its remarkable archaeological, cultural,
and natural values. To safeguard the thousands of irreplaceable archaeological sites
and the cultural and ecological integrity of the Monument, among other things,
President Obama set aside 1.35 million acres for permanent protection pursuant to
the Antiquities Act of 1906, 54 U.S.C. §§ 320301 *et seq*. The creation of the Bears
Ears National Monument provided needed protection to a variety of natural and
historic treasures, including scenic landscape formations and cultural sites that
Native Americans have held sacred for thousands of years.

3.      President Trump's unlawful proclamation purports to revoke
monument status entirely from eighty-five percent of the Bears Ears National
Monument, or 1.15 million acres. President Trump's unlawful proclamation also
purports to weaken the legal protections that apply in the two small units that
retain their status as national monument lands.

4.      President Trump's action is contrary to the Antiquities Act, which
authorizes Presidents to create national monuments, but not to abolish them in

whole or in part. Only Congress—not the President—has the power to revoke or modify a national monument. President Trump's proclamation purporting to dismantle Bears Ears National Monument exceeded his authority and is unlawful.

5.     Beginning with Theodore Roosevelt, Presidents have exercised their authority under the Antiquities Act to designate more than one hundred fifty national monuments throughout our country to protect landscapes of extraordinary beauty, as well as irreplaceable and exceptional objects and sites of scientific and historic importance. National monuments include important American icons like the Statue of Liberty in New York, Muir Woods in California, Organ Pipe Cactus in Arizona, and Misty Fjords in Alaska. Many national parks, including Grand Canyon and Zion, began as national monuments. In the 111 years since its enactment, the Antiquities Act has provided lasting and valuable protection to the nation's cultural, natural, and historic heritage.

6.     Following the example set by his predecessors, President Obama relied on the Antiquities Act to establish the Bears Ears National Monument by Proclamation in 2016. *See* Proclamation No. 9558, Establishment of the Bears Ears National Monument, 82 Fed. Reg. 1139 (Dec. 28, 2016) (the 2016 Proclamation). The 2016 Proclamation conferred national monument status and a variety of specific protections on 1.35 million acres of federal public land in southeastern Utah, bordered by Canyonlands National Park to the north and the Navajo Nation to the south. The 2016 Proclamation directed the Bureau of Land Management (the

BLM) and U.S. Forest Service to take specific actions to ensure protection of the scientific and historic objects within the Monument.

7.      President Obama based the 2016 Proclamation on information obtained through deliberations, studies, and meetings with Native American tribes, state and local officials, and other stakeholders, as well as an assessment of the important cultural, historic, and scientific resources at risk in the Bears Ears area.

8.      The Bears Ears National Monument was the 153rd national monument to be established under the Antiquities Act. It encompasses magnificently scenic federal public lands that have been home to Native American tribes for over a thousand years. Early inhabitants of these lands left remarkable artifacts, including cliff dwellings, granaries, pottery, and rock art, and the lands still have profound cultural and religious importance to Native Americans today. The Monument includes ceremonial sites and medicinal and ceremonial plants gathered today by Native American peoples. The Monument also encompasses an extraordinary scenic landscape of sinuous canyons and towering sandstone formations. The outstanding opportunities to observe archaeological sites, conduct scientific research, hike, camp, view the native animal and plant life, and engage in other recreational activities have drawn national interest, and thousands of visitors, to Bears Ears.

9.      President Trump's proclamation purports to eliminate national monument status and protection from the vast majority of the Monument, including a substantial part of Cedar Mesa, part of Indian Creek, Grand Gulch, Beef Basin,

Dark Canyon Plateau, White Canyon, Fry Canyon, Jacob's Chair, Cheesebox, Polly

Mesa, Red House Cliffs, Dry Mesa, and Seven Sisters Buttes.



*Fig. 1: Revocation of Bears Ears National Monument and replacement with non-contiguous "Indian Creek" and "Shash Jáa" units, as announced on December 4, 2017*
*Credit: SUWA*

    10.    President Trump's action exceeds his authority under the Antiquities

Act and threatens the remarkable historic and scientific values that qualified Bears

Ears for designation as a national monument. Accordingly, this Court should declare President Trump's proclamation to be unlawful and set it aside. This Court should further enjoin Defendants from complying with President Trump's unlawful proclamation or engaging in any activities inconsistent with the terms of the 2016 Proclamation.

## JURISDICTION AND VENUE

11.     This case arises under the Constitution and the laws of the United States. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question). Jurisdiction is also proper pursuant to 5 U.S.C. §§ 701-706 (the Administrative Procedure Act).

12.     The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized by 5 U.S.C. § 706.

13.     The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

14.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1) because all Defendants reside in this judicial district. Additionally, the events giving rise to the action challenged here, including Defendant Zinke's national monument review and transmittal of his recommendations to the President concerning the Monument, took place in this judicial district.

15.     Venue is also proper pursuant 28 U.S.C. § 1391(e)(1) because Plaintiffs National Parks Conservation Association, The Wilderness Society, and Defenders of

Wildlife reside in Washington, D.C., and Plaintiffs Natural Resources Defense

Council, Southern Utah Wilderness Alliance, Sierra Club, and Center for Biological

Diversity maintain offices in Washington, D.C.

## PLAINTIFFS

16.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL, INC.

(NRDC) is a non-profit environmental membership organization with hundreds of

thousands of members nationwide. Part of NRDC's core mission is to preserve the

earth's wild places and wildlife, to safeguard the integrity of undeveloped lands, and

to prevent the destructive impacts of extractive industry exploration and

development on public lands.

17.     NRDC has a longstanding commitment to the protection of federal

public lands in Utah, and it was actively involved in advocating for the designation

of the Bears Ears National Monument.

18.     NRDC has individual members, including Moab residents Susan

Harrington and Kevin Walker, who use and enjoy the Monument lands for a variety

of purposes, including scientific study, hiking and recreation, wildlife viewing,

meditation and quiet contemplation, and aesthetic appreciation. These NRDC

members intend to continue visiting the Bears Ears National Monument (including

lands that have now been stripped of protection) in the future. For example, both

Ms. Harrington and Mr. Walker plan to return there for backpacking trips in the

next six months and beyond.

19.     Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION
(NPCA) is a non-profit national organization whose primary mission is to address
major threats facing the National Park System and other protected federal lands
with an ecological, management, or other nexus to National Parks. NPCA is the
leading voice of the American people in protecting and enhancing the National Park
System and other protected federal lands, and it has more than 1.2 million
members and supporters throughout the United States.

20.     NPCA plays a crucial role in ensuring that America's national parks
and national monuments are protected in perpetuity by undertaking a variety of
efforts, including educating decision-makers and the public about the importance of
preserving these landscapes, lobbying members of Congress to uphold legal
protections for national parks and other protected lands, and assessing the health of
national parks and monuments and advocating for their effective management.

21.     NPCA has been a strong and consistent advocate for safeguarding the
threatened cultural and sacred sites in the Bears Ears National Monument. It has
members, including David Nimkin, who regularly visit the Monument (including
lands that have now been stripped of protection) to camp, sightsee, view native
wildlife and vegetation, hike, and enjoy the many cultural sites that can be found
there. Mr. Nimkin and other members also plan to visit the Monument regularly in
the future, including in 2018.

22.     Plaintiff THE WILDERNESS SOCIETY is a non-profit national membership organization founded in 1935, with members who reside throughout the nation, including in Utah.

23.     The Wilderness Society works to protect America's wilderness lands through public education, scientific analysis, and advocacy. The Wilderness Society's mission is to protect wilderness and inspire Americans to care about our wild places, so that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountains, forests, and rivers provide. Protecting wilderness quality and other sensitive lands managed by the BLM is vital to achieving The Wilderness Society's mission.

24.     Prior to the designation of the Bears Ears National Monument, The Wilderness Society had already worked for years to protect BLM wilderness lands and other sensitive lands located within the Monument. In an effort to protect the threatened wilderness, and cultural and other resources on lands within the Monument, The Wilderness Society has been actively involved in land-use and travel-management planning on public lands there, and has litigated to secure additional protection of these lands from off-highway vehicle abuse and other harmful activities. The Wilderness Society also engaged intensively in the "Public Lands Initiative" legislative effort, which included lands within the Monument.

25.     Many of The Wilderness Society's members, including Scott Miller, visit the lands within the Bears Ears National Monument (including lands that

10

have now been stripped of protection) to experience its remote wilderness quality, view wildlife, camp, hike, and enjoy the natural beauty of the area. Additionally, its members are drawn to the Bears Ears National Monument to view the numerous archaeological sites and rock art found throughout the area and to experience the landscape much as it was when the first Native Americans occupied the area. Mr. Miller and other members of The Wilderness Society plan to visit the area regularly in the future, including in 2018.

26.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (SUWA) is a non-profit environmental membership organization with members in all fifty states and offices in Washington, D.C., and Utah. It is dedicated to the sensible management of federal public lands within the State of Utah, the preservation and protection of plant and animal species, the protection of clean air and water found on federal public lands, the preservation and protection of cultural and archeological resources, and the permanent preservation of Utah's remaining wild lands.

27.     SUWA staff and members actively encouraged President Obama to exercise his authority under the Antiquities Act to designate the Bears Ears National Monument and preserve the objects identified in the 2016 Proclamation for current and future generations of Americans.

28.     SUWA staff and members have worked for more than thirty years through advocacy and litigation to obtain protection for the Bears Ears area and will continue to work towards this end, including by actively engaging in Monument

planning for the lands that remain in the Monument and by advocating for the protection of former Monument lands.

29.     SUWA has individual members—including Ray Bloxham and Neal Clark—who often visit the Bears Ears National Monument (including lands that have now been stripped of protection) for a host of reasons, including spiritual renewal, recreation, and appreciation of the area's significant cultural resources, flora and fauna, and geology. SUWA members, including Mr. Bloxham and Mr. Clark, plan to visit the area regularly in the future, including in 2018.

30.     Plaintiff GRAND CANYON TRUST is a non-profit public lands advocacy organization founded in 1985. The Grand Canyon Trust's members and staff live and work throughout the Colorado Plateau, in Utah, Colorado, Arizona, and New Mexico. The Grand Canyon Trust's mission is to protect and restore the public lands throughout the Colorado Plateau. Through its advocacy, the Grand Canyon Trust ensures that the Colorado Plateau remains characterized by vast open spaces, healthy ecosystems, and communities enjoying a sustaining relationship with the natural environment.

31.     The Grand Canyon Trust's Native America program focuses in part on protecting tribally important sacred sites by backing the creation of inter-tribal partnerships to support culturally-guided conservation.

32.     The Grand Canyon Trust's members and staff have long advocated for the protection of the 1.35 million acres of federal public lands within the Bears Ears National Monument. Grand Canyon Trust staff, its board of trustees, and its

members provided support and technical assistance to the Bears Ears Inter-Tribal Coalition, tribal elected officials, and cultural and spiritual leaders, and they work to educate the broader public, federal government, and local communities about the need for permanent protection of the Bears Ears National Monument.

33.    The Grand Canyon Trust's staff and members will continue to work with the Bears Ears Inter-Tribal Coalition, tribal governments, legal advisors, and conservation partners over the coming months and years to ensure the maximum protection for the Monument.

34.    The Grand Canyon Trust's members and staff, including Tim Peterson, regularly visit areas in the Bears Ears National Monument, including Elk Ridge, Cedar Mesa, Dark and White Canyons, Comb Wash, Grand Gulch, Cottonwood Canyon, Valley of the Gods, Blue Creek Canyon, and the Indian Creek corridor to recreate, find solitude, view pictographs and petroglyphs, experience wilderness, hunt and fish, and monitor and study wildlife and plants. Its members, including Mr. Peterson, will continue to visit the Monument in the future to engage in these activities, including in 2018.

35.    Plaintiff GREAT OLD BROADS FOR WILDERNESS (Great Old Broads) is a national grassroots non-profit organization, led by elders, that engages in and inspires activism to preserve and protect wilderness and wild lands. Great Old Broads has over 8,000 members and supporters, many of whom reside and/or engage in recreational activities in Utah. It was formed, in part, to protect the interests of senior populations who value roadless areas, enjoy them without

mechanized means of transportation, and want to see these areas protected in their natural state for future generations.

36.     Protection of wild federal public lands in southern Utah has been an important focus of Great Old Broads since it began in 1989. Great Old Broads has conducted educational and advocacy activities on the significance of the lands included in the Bears Ears National Monument, including by monitoring illegal motorized use, evaluating rangeland health, working with agencies on stewardship projects, providing comments during public land agency processes, litigating on issues related to land use and cultural resource protection, participating in collaborative public land management efforts, and educating its members and the public about the many values of the region. Great Old Broads has held several multi-day camping events to become intimately knowledgeable of the region, including a sixty-person, five-day educational campout in September 2016.

37.     Members of Great Old Broads, including Steve Allen, visit the federal public lands in the Monument (including lands that have now been stripped of protection) to hike, backpack, enjoy the outstanding scenery and fascinating archaeological sites, view native plant and animal life, take photographs, and experience the remoteness and quiet of the area. Mr. Allen and other members regularly visit the Monument lands and will continue to do so, including in 2018.

38.     Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a non-profit environmental organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, advocacy in land

14

management wildlife agencies, promotion of sound public policy initiatives, and litigation. Headquartered in Hailey, Idaho, WWP has field offices and members throughout the west. WWP works to influence and improve public lands management throughout the West and protect the ecological, biological, cultural, historic, archeological, and scenic resources; wilderness; and other natural values found there.

39.    WWP supported the Monument's creation and has worked for many years to protect and restore the federal public lands included in the Bears Ears National Monument. Its staff and members, including Erik Molvar, Laura Welp, and Jonathan Ratner, regularly visit these lands for hiking, camping, enjoyment and appreciation of ancient ruins, nature study, wildlife viewing, and appreciation of its geological wonders and natural beauty; Mr. Molvar, Mr. Ratner, and many others have plans to return there in the near future, as early as spring 2018.

40.    Plaintiff SIERRA CLUB was founded in 1892 and is the nation's oldest grassroots environmental organization. It is a national non-profit organization of over 800,000 members, including a Utah chapter with thousands of members. The Sierra Club's purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Among the Sierra Club's highest priorities is protecting and preserving national monuments. The Sierra Club's concerns encompass all aspects of the

Bears Ears National Monument, including the protection of wildlands, wildlife habitat, water resources, air, archaeological sites, public health, and the health of its members, all of which stand to be affected by Defendants' actions as set forth herein.

41.     Sierra Club members live near, use, and enjoy the Bears Ears National Monument (including lands that have now been stripped of protection) for outdoor recreation and scientific study of various kinds, including nature study, birdwatching, photography, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities; they will continue to do so in the future.

42.     Sierra Club members' concerns encompass the exploration, enjoyment, and protection of the Monument for themselves and future generations. For example, Sierra Club Utah Chapter member Wayne Hoskisson began hiking there in the mid to late 1980s and has visited the area over one hundred times and plans to continue. Since 1995 he has actively pursued protective legislation for much of the region through volunteer lobbying and engaging the public.

43.     Sierra Club has a longstanding interest in protecting the Monument. Since at least the 1980s, Sierra Club's Utah Chapter has proposed protections for much of the land that is now within the Monument. Sierra Club has worked over the decades with numerous federal, state, and local government officials, environmental organizations, and the local tribes to obtain long overdue protections for this land. Sierra Club has actively supported the Monument by, among other things, organizing meetings and letter writing campaigns, providing public

16

comments, and helping to organize public rallies in support of the Monument designation.

44.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a national non-profit organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center has over 61,000 members and is headquartered in Tucson, Arizona.

45.     The Center's members and staff, including Taylor McKinnon, have visited the federal public lands within the Bears Ears National Monument (including lands that have now been stripped of protection) and intend to continue to do so for hiking, camping, viewing and studying wildlife, photography, and other vocational and recreational activities. The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members and staff, including Mr. McKinnon, have specific intentions to continue using and enjoying these areas frequently and on an ongoing basis in the future.

46.     The Center has a long history of environmental advocacy within the southwestern United States generally, and in relation to public lands conservation in particular. As relevant here, the Center has worked to protect species and habitats found on these federal public lands in Utah, including the Mexican Spotted Owl, northern goshawk, spotted bat, Southwestern willow flycatcher, yellow-billed cuckoo, California condor, Navajo sedge, Colorado pikeminnow, bonytail chub, humpback chub, and razorback sucker (a rare desert fish found in the San Juan

17

River and tributaries to the San Juan and Colorado Rivers within the Monument boundaries). The Center participated in efforts to establish the Bears Ears National Monument that culminated in the 2016 Proclamation.

47.     Plaintiff WILDEARTH GUARDIANS (Guardians) is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. The protection of the Monument is vital to this work because the Monument preserves large tracts of unrestricted wildlife habitat and migration routes. Thus, Guardians has an interest in the protection of the Monument and the ecological resources contained therein that will be harmed by the removal of the protections afforded by national monument status.

48.     Guardians has more than 184,000 members and supporters including many who recreate on federal public lands in Utah, and specifically in the Bears Ears National Monument. Guardians has a long-standing interest in the preservation of the Bears Ears National Monument that will be harmed by the revocation of the protections conferred by national monument status. Over the last decade, Guardians has advocated for prohibitions on oil and gas leases and other development that would harm the natural and cultural values on public lands in the Bears Ears region.

49.     Guardians staff and members, including James Martin, regularly visit the Bears Ears National Monument (including lands that have now been stripped of protection) for the purposes of hiking, observing archeological sites including cliff dwellings, bird watching, observing wildlife, spiritual rejuvenation, photography,

18

and other recreational and professional pursuits. Guardians staff and members, including Mr. Martin, have engaged in these activities in the Bears Ears National Monument in the past and have firm plans to participate in these activities in the Monument in the near future.

50.    Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a national, non-profit conservation organization founded in 1947, which is dedicated to the protection of all native animals and plants in their natural, undeveloped, native habitats. Headquartered in Washington, D.C., Defenders has more than 1.2 million members and supporters throughout the United States, including in Utah.

51.    Defenders works to ensure that the diverse wildlife populations in North America are secure and thriving, sustained by a network of healthy lands and waters. Through education, advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend. The Bears Ears National Monument is vital to this work due to its relatively intact and functional western landscape and because of its regionally significant connectivity, a crucial factor in the conservation of fish and wildlife populations.

52.    Defenders has organizational and membership-based interests in the preservation and conservation of the Monument and the ecological resources contained therein that will be harmed by the removal of the protections afforded by Bears Ears' national monument status. Defenders' members and staff, including Kim Crumbo, regularly visit the Monument for wildlife observation, recreation, and other uses. These members derive aesthetic, educational, professional, health, and

spiritual benefits from their activities within the Monument that will be harmed by the revocation of the Monument's protections. Defenders' members and staff, including Mr. Crumbo, have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

## DEFENDANTS

53.     Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States. He currently resides and conducts his duties in Washington, D.C.

54.     Defendant RYAN ZINKE is sued in his official capacity as the Secretary of the Interior of the United States.

55.     Secretary Zinke is responsible for ensuring that the Department of the Interior and its constituent agencies, including the BLM, comply with the applicable law, including the 2016 Proclamation's direction and requirements for managing the Monument.

56.     The Secretary of the Interior resides and conducts his duties in Washington, D.C.

57.     Defendant BRIAN STEED is sued in his official capacity as the official who is exercising the authority of the Director of the BLM within the U.S. Department of the Interior.

58.     The Director of the BLM (and currently, Mr. Steed) is responsible for ensuring that the BLM complies with the applicable law, including the 2016 Proclamation's direction and requirements for managing the Monument.

20

59.     The Director of the BLM (and currently, Mr. Steed) resides and conducts his duties in Washington, D.C.

60.     Defendant SONNY PERDUE is sued in his official capacity as the Secretary of Agriculture of the United States.

61.     Secretary Perdue is responsible for ensuring that the Department of Agriculture and its constituent agencies, including the U.S. Forest Service, comply with the applicable law, including the 2016 Proclamation's direction and requirements for managing the Monument.

62.     The Secretary of Agriculture resides and conducts his duties in Washington, D.C.

63.     Defendant TONY TOOKE is sued in his official capacity as Chief of the U.S. Forest Service within the U.S. Department of Agriculture.

64.     Mr. Tooke is responsible for ensuring that the U.S. Forest Service complies with the applicable law, including the 2016 Proclamation's direction and requirements for managing the Monument.

65.     The Chief of the U.S. Forest Service resides and conducts his duties in Washington, D.C.

66.     The above-named Defendants have the authority, ability, and obligation to remedy the harms alleged to Plaintiffs' interests.

# BACKGROUND

## The Antiquities Act

67.     The U.S. Constitution's Property Clause gives Congress the exclusive "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. Exercising this power, Congress may withdraw federal public land from entry or manage it and prescribe limitations on its use. It may also sell, lease, or otherwise convey federal public land to third parties.

68.     In 1906, Congress delegated a part of its Property Clause power to the President when it enacted the Antiquities Act. The Act authorizes the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," and to "reserve parcels of land as a part of the national monuments" that comprise the "smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(a), (b).

69.     Using Congress's delegation of authority in the Antiquities Act, Presidents have declared by proclamation 157 national monuments in thirty-two states, four territories, two oceans, and the District of Columbia. Depending on the nature and location of the objects to be protected, national monument designations have ranged from just a few acres to millions of acres in size.

70.    A President's national monument designation immediately confers

enhanced protection for the "objects of historic or scientific interest" and the lands

on which they are found. *Id.* § 320301(a). Once designated as a national monument,

those lands must be managed for the purpose of preserving and safeguarding the

objects of scientific and historic interest located there. The protection of the

identified objects of historic or scientific interest is the paramount purpose for

which the land is to be managed.

71.    Frequently, as in the case of the Bears Ears National Monument, the

federal agencies charged with protecting and managing the monuments must

prepare land management plans, with public participation, to ensure that the

protective purposes for which the monument was designated are fulfilled.

72.    The President may also spell out specific use restrictions in the

proclamation itself. For example, to ensure that objects of historic or scientific

interest are effectively protected, Presidents have used their Antiquities Act

authority to "withdraw" national monument lands from mineral location under the

General Mining Law of 1872, 30 U.S.C. § 21 *et seq.*, and from leasing for oil and gas

exploration and development under the Mineral Leasing Act of 1920, 30 U.S.C.

§ 181 *et seq.*—as President Obama did in the 2016 Proclamation establishing the

Bears Ears National Monument.

73.    In addition, to protect objects of historic or scientific interest,

Presidents have used their Antiquities Act authority to limit the building of roads

and the use of motorized vehicles on national monument lands—as President

23

Obama did in the 2016 Proclamation establishing the Bears Ears National
Monument.

74.     In the Antiquities Act, Congress granted the President *limited*
authority to "*declare* . . . national monuments" and "*reserve* parcels of land as a part
of the national monuments." 54 U.S.C. § 320301(a), (b) (emphases added). Congress
did *not* authorize the President to abolish national monuments, in whole or in part,
once they have been designated. That power belongs to Congress alone.

**The Scientific, Historic, and Cultural Significance of the Bears Ears
Landscape**

75.     The Bears Ears National Monument lies in the heart of the Colorado
Plateau in one of the least developed areas in the contiguous United States.

76.     The landscape is a rugged labyrinth of sandstone canyons, cliffs and
rock arches, juniper forests, meadows, and desert mesas. Near its center are the
iconic twin buttes known as the Bears Ears.

77.     For thousands of years, the area has been inhabited by members of
Native American tribal groups, including the Navajo Nation, Hopi Tribe, Ute Indian
Tribe, Ute Mountain Ute Tribe, and Pueblo of Zuni, among others. The Bears Ears
National Monument is an ancestral homeland for these tribes, and it has deep
spiritual, historic, and cultural significance for them. For thousands of years, these
people farmed, herded, and hunted wildlife here; they gathered plants for food,
medicine, and textiles; they created rock art and built homes and other structures;

24

they developed and maintained deep systems of traditional knowledge about the landscape; they buried their ancestors.

78.    The tribes' history is written on the landscape today: the Bears Ears area is intensely rich with petroglyphs and rock paintings, ancient cliff dwellings, granaries, graves, ceremonial sites, and the remnants of carefully planned and constructed villages, some dating back thousands of years.

79.    Today, the tribes' members regularly visit the Bears Ears area to honor their ancestors, to connect with the land, to participate in religious and cultural ceremonies, to hunt and to gather food and medicine, and to transmit their traditional knowledge to the next generation.

80.    The cultural history, artifacts, and cultural sites in the Bears Ears National Monument have significant value for the American public at large, including Plaintiff organizations and their members. Plaintiffs' members visit this area to learn more about Native American history and to view, appreciate, and study the rock art and other artifacts found throughout the 1.35 million acre Monument.

81.    The Bears Ears National Monument also contains rich resources for scientific study. The landscape's many canyons and exposed layers of sedimentary rock found throughout much of the Monument offer geologists a view of our continent that stretches millions of years back in time. Some of the area's fossil resources may be found nowhere else but in the Bears Ears area. As a coalition of paleontologists explained in a letter to President Obama in October 2016, the

25

landscape's fossil-bearing rocks offer "an unparalleled record of ancient seas that covered the continent, the rise of vertebrate life on land, the ascendency of the dinosaurs, and even the remains of Ice Aged animals who once roamed the high plateaus and deep canyons that make the landscape of the Bears Ears area so visually stunning today."

82.     The Bears Ears National Monument contains a diversity of wildlife, including bighorn sheep, mule deer, elk, mountain lions, bear, bobcats, foxes, eagles, spotted owls, willow flycatchers, and other migratory and endemic birds. The creeks and tributaries support rare desert fishes such as the razorback sucker.

83.     The Bears Ears National Monument is remarkably scenic and remote. It has some of the most outstanding dark skies, free from light pollution and providing optimal stargazing, in North America. It offers unique and outstanding opportunities for sight-seeing, hiking, backpacking, wildlife viewing, spiritual reflection, and other outdoor activities in an awe-inspiring natural setting.

**Pre-Monument Management of Federal Public Lands Within the Bears Ears Area**

84.     The lands that President Obama designated as the Bears Ears National Monument have been federally owned public lands ever since the United States acquired them from Mexico in the Treaty of Guadalupe Hidalgo in 1848— long before President Obama's 2016 Proclamation.

85.     As of 2016, some of these lands were managed by the U.S. Forest Service and some were managed by the BLM. The Forest Service managed its

parcels pursuant to the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, and the BLM managed its parcels pursuant to the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*

86.    Both these statutes include a general mandate to manage federal public lands in accordance with the "multiple use, sustained yield" principle, which allows for a range of uses, including oil and gas drilling, mining, and off-highway vehicle use, as well as wilderness protection. *See* FLPMA, 43 U.S.C. §§ 1702(c), 1712(c)(1) (implementing multiple use in development and revision of land use plans); NFMA, 16 U.S.C. § 1604(e)(1) (same).

87.    This multiple-use approach to land management in the Bears Ears region failed to safeguard the unique landscape and the historic and cultural sites situated there.

88.    For example, ineffective management and poorly regulated off-highway vehicle use led to environmental damage as well as the looting and vandalism of graves, cultural sites, and fossils. In recent years, on their trips throughout the Bears Ears region, members of the Plaintiff organizations often observed growing evidence of damaging off-highway vehicle use, including repeated stream crossings, trampled vegetation, rutted and broken soil, and unauthorized vehicle trails leading to cultural sites that had been damaged or destroyed.

89.    Prior to the Monument designation, the BLM regulated off-highway vehicle use in the portion of Bears Ears under its jurisdiction according to the agency's Monticello and Moab Field Office Resource Management Plans and their

27

off-highway vehicle travel management plans. Those plans did not consider the impacts of motorized vehicle use on cultural resources, and they failed to mitigate the harms of off-highway vehicle use on those cultural sites, on fossil resources, or on the fragile ecosystem. On the contrary, in its 2013 review of the Monticello travel plan, the BLM acknowledged that "route and travel designations in the [plan] fail to address cultural and paleontological needs and protection."

90.     Similarly, prior to the Monument designation, the Forest Service regulated off-highway vehicle use in the portion of Bears Ears under its jurisdiction (the Manti-La Sal National Forest) according to the agency's Monticello Ranger District travel plan. The Forest Service's 1986 travel plan, like the BLM's plans, failed to protect cultural sites, fossils, or the fragile ecosystem, allowing widespread damage.

91.     Additionally, prior to the Monument designation, the BLM and the Forest Service permitted the leasing and exploration of federal lands throughout Bears Ears for oil and gas development and mining—activities that damaged the unique features of the Bears Ears landscape.

92.     This damage has included clearing vegetation, leveling, construction of well pads, exploratory drilling, new or expanded road surfaces, increased traffic and dust, impacts to viewsheds, degradation of wildlife habitat, and disturbance to wildlife movement corridors. Emissions from oil and gas drilling has degraded air quality.

93.     Also prior to the Monument designation, prospectors in search of uranium deposits routinely "located" or staked new mining claims wherever they wished on the available federal public lands in the Monument. In pursuit of their mining activities, they undertook "notice-level" surface-disturbing activities—such as road building and drilling—under the permissive provisions of the General Mining Law of 1872, with damaging and disruptive effects on the surrounding land.

94.     To address these ongoing harms, a broad range of groups, led by the tribes and including Plaintiffs, spent years advocating for greater protection of the Bears Ears landscape. For example, NRDC, The Wilderness Society, SUWA, Great Old Broads for Wilderness, and the Grand Canyon Trust spent decades advocating for the permanent protection of Bears Ears. To ensure that the lands remained unmarred pending that protection, they watchdogged the BLM's proposals to offer oil and gas leases in Bears Ears and challenged many of those plans.

## The 2016 Proclamation Designating the Bears Ears National Monument

95.     In 2015, tribal leaders from the Navajo Nation, Hopi Tribe, Ute Indian Tribe, Ute Mountain Ute Tribe, and Pueblo of Zuni collectively formed the Bears Ears Inter-Tribal Coalition. The Coalition crafted a comprehensive proposal for the creation and management of a Bears Ears National Monument, and they submitted the plan to President Obama in October 2015.

96.     The Coalition's proposal was the first petition ever submitted by Native American tribes seeking the establishment of a national monument. Their

proposal laid out a detailed case for conferring monument status on lands within the Bears Ears region, identified particular sites and objects of historic and scientific interest that merited immediate protection under the Antiquities Act, and proposed a framework for collaborative management of the Monument by the tribes and the federal government.

97.     Plaintiffs actively supported the Coalition's efforts to designate the Monument and provide it with the necessary protection. Among other things, they asked their members to contact President Obama, the Secretary of the Interior, and the Secretary of Agriculture, and to urge them to protect the Bears Ears region. Several Plaintiffs also attended numerous meetings held by these officials and their staff to explain why protection under the Antiquities Act was warranted and to encourage them to support a monument designation for Bears Ears.

98.     The Coalition's and Plaintiffs' efforts finally led, in 2016, to President Obama's proclamation establishing the Bears Ears National Monument. The 2016 Proclamation specifically invokes the President's authority under the Antiquities Act and describes in detail the geological, paleontological, archaeological, historic, cultural, and ecological significance of the Bears Ears landscape and the landmarks and objects found there, and it sets forth provisions and requirements that are essential to their future protection.

99.     Cultural sites important to Native American tradition and history occur throughout the Bears Ears National Monument, and many have been damaged by looting, vandalism, and other impacts. In recognition of the extensive

distribution of these valuable sites and the importance of protecting them, as well as the presence of other objects requiring protection throughout the Bears Ears region, President Obama determined that the boundaries of the Bears Ears National Monument represented the smallest size compatible with the protection of the objects of historic and scientific interest contained therein.

100.   The 2016 Proclamation made clear that the objects of historic or scientific interest were immediately subject to the Antiquities Act's protections, stating: "Warning is hereby given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument and not to locate or settle upon any of the lands thereof."

101.   The 2016 Proclamation spelled out several specific protections and use limitations. It provided that "[a]ll Federal lands . . . within the boundaries of the monument are hereby appropriated and withdrawn from all forms of entry, location, selection, sale, or other disposition[;] . . . from location, entry, and patent under the mining laws[;] and from disposition under all laws relating to mineral and geothermal leasing." The 2016 Proclamation thereby immediately prohibited the location of any new mining claims and the offering of any new leases, including the processing of non-competitive lease sale offers, for oil and gas development.

102.   The 2016 Proclamation also directed the Forest Service and the BLM to undertake specific actions to protect the Monument. The agencies are required to "manage the monument" consistent with "the purposes of this proclamation"—that

is, the protection of the listed geological, paleontological, archaeological, historic, cultural, and ecological resources that occur throughout the Monument.

103.   The 2016 Proclamation placed all BLM-managed lands within the Monument into the National Landscape Conservation System, 16 U.S.C. § 7201 *et seq.*, which required the BLM to manage existing recreational uses, mining claims, and leasehold activities in the Monument in a manner that protects the geological, paleontological, archaeological, historic, cultural, and ecological resources described in the 2016 Proclamation.

104.   Further, the 2016 Proclamation provided that "the Secretaries [of Agriculture and of the Interior] shall jointly prepare a management plan for the monument and shall promulgate such regulations for its management as they deem appropriate."

105.   The 2016 Proclamation also required that the Forest Service and the BLM, consistent with their duty to protect Monument resources, "prepare a transportation plan that designates the roads and trails where motorized and non-motorized mechanized vehicle use will be allowed." Even before that transportation plan is in place, however, the Proclamation itself imposed new limitations on off-highway vehicle use. It prohibited the construction or designation of any new roads or trails except those that are "for the purposes of public safety or protection of [the Monument's] objects." Further, it specified that use of existing roads or trails already designated for off-highway vehicle use could continue pending completion of

the plan, but only if such use was "consistent with the care and management of [the protected] objects."

106.    The 2016 Proclamation went on to "establish[]" the "Bears Ears Commission" (the Commission): a unique advisory council consisting of "one elected officer each from the Hopi Nation, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe of the Uintah Ouray, and [Pueblo of] Zuni." The Commission's purpose was to "provide guidance and recommendations on the development and implementation of management plans and on management of the monument." In March 2017, the five tribes each formally named one representative to the Commission, thereby constituting it.

107.    The 2016 Proclamation also established a way for non-tribal stakeholders to participate in the Monument's management by directing the Secretaries, through the BLM and the Forest Service, to "establish an advisory committee under the Federal Advisory Committee Act . . . consist[ing] of . . . interested stakeholders" to contribute "information and advice regarding the development of the management plan and, as appropriate, management of the monument."

108.    On January 18, 2017, the BLM and the Forest Service announced their intent to publish in the Federal Register a call for nominations to recruit twelve members for the Monument's advisory committee, including a representative from the environmental community and representatives with paleontological and historic

or archaeological expertise. As of the date of this complaint's filing, however, no such call for nominations has been issued.

109. Plaintiffs Grand Canyon Trust, SUWA, and NPCA formally sought a seat on the advisory committee.

110. On February 28, 2017, the Grand Canyon Trust wrote to the BLM and the Forest Service requesting "that Grand Canyon Trust's Utah Wildlands Program Director Tim Peterson serve as a member of the Bears Ears National Monument Advisory Committee." On March 20, 2017, the BLM responded that it was not accepting nominations for the Committee.

111. On March 13, 2017, SUWA wrote to the BLM requesting a seat for Ray Bloxham, SUWA's Field Director and a SUWA member, on the Advisory Committee. On April 4, 2017, the BLM responded that it was not accepting nominations for the Committee.

112. NPCA made a verbal request to the BLM for a seat on the Committee. The BLM again declined, saying that it was not accepting applications for Committee participation.

### President Trump's decision to revoke monument status from eighty-five percent of the Bears Ears National Monument

113. Even before President Trump's January 20, 2017 inauguration, Utah politicians, including members of the state's congressional delegation, began to lobby him to abolish or severely shrink the Monument.

114.    On April 26, 2017, President Trump acceded to the Utah politicians'
demands and issued Executive Order 13,792, 82 Fed. Reg. 20,429 (Apr. 26, 2017),
which directed the Secretary of the Interior to "review" all monuments designated
or expanded since 1996 that (a) were 100,000 acres or larger after the designation
or expansion, or (b) were, in the Secretary's view, created or expanded without
"adequate public outreach." The Executive Order required the Secretary to provide
reports and recommendations to the President concerning possible actions
regarding those monuments.

115.    As the President prepared to sign the order, Vice President Mike Pence
presaged the outcome of the review, explaining that President Trump was about "to
undo one of the great Federal overreaches of recent decades: the abuse of the
Antiquities Act . . . to grab land and power at the American people's expense."
President Trump followed with his own preview of the outcome of the process: "I'm
signing a new executive order to end another egregious abuse of federal power,"
referring to previous Presidents' use of the Antiquities Act. Although the affected
monument lands are federal public property owned by all Americans and have
never been under state control, the President declared: "Today we are putting the
states back in charge."

116.    The President highlighted the lobbying by Senators Orrin Hatch and
Mike Lee of Utah to reverse monument designations in Utah, stating, "I'm very
proud to be doing it in honor of you guys." Finally, he opined that the Bears Ears
National Monument "should never have happened." These remarks were made on

April 26, 2017, predating the commencement of the Secretary of the Interior's "review."

117. Executive Order 13,792 directed the Secretary of the Interior to evaluate the monuments by reference to a variety of factors absent from the Antiquities Act, including:

(i) "the effects of a designation on the available uses of designated Federal lands, including consideration of the multiple-use policy of section 102(a)(7) of the Federal Land Policy and Management Act (43 U.S.C. § 1701(a)(7)), as well as the effects on the available uses of Federal lands *beyond* the monument boundaries;

(ii) "the effects of a designation on the use and enjoyment of non-Federal lands within or *beyond* monument boundaries;

(iii) "concerns of State, tribal, and local governments affected by a designation, including the economic development and fiscal condition of affected States, tribes and localities;

(iv) "the availability of Federal resources to properly manage designated areas; and

(v) "such other factors as the Secretary deems appropriate."

Exec. Order No. 13,792 § 2(a) (emphasis added).

118. Bears Ears received particular attention in President Trump's April 26 Executive Order. While the Order gave the Secretary of the Interior 120 days to review all other monuments, it required him to submit an "interim report" on Bears

36

Ears specifically within forty-five days—i.e., by June 10, 2017. The Executive Order directed Secretary Zinke to provide "recommendations for such Presidential actions, legislative proposals, or such other actions consistent with the law as the Secretary may consider appropriate" to "balance the protection of . . . objects against the appropriate use of Federal lands and the effects on surrounding lands and communities." Exec. Order No. 13,792 §§ 1, 2(d). Secretary Zinke explained in a press briefing that his review would focus on whether the monuments should be "rescinded, resized, [or] modified."

119.    On May 11, 2017, the Department of the Interior began accepting public comments on the twenty-seven monuments fitting the criteria described in the Executive Order, including Bears Ears.

120.    Initially, the Department of the Interior's public comment period for Bears Ears was open for just fifteen days. Even in that short time, hundreds of thousands of commenters, including Plaintiffs and their members, submitted comments in support of Bears Ears.

121.    Secretary Zinke submitted his interim report on Bears Ears to President Trump on June 10, 2017. Although Secretary Zinke conceded that the Monument "contains unique geologic features and objects of historic or scientific interest," he opined that "the [Monument] boundary [should] be revised through use of appropriate authority, including lawful exercise of the President's authority granted by the [Antiquities] Act." Secretary Zinke "further recommend[ed] that the

37

Department of the Interior conclude the full [120-day] review . . . before more specific recommendations are made regarding the Bears Ears National Monument."

122.   The Department then re-opened the public comment period on Bears Ears until July 10, 2017. On information and belief, the public comments overwhelmingly favored leaving Bears Ears intact.

123.   On information and belief, the Forest Service submitted comments on the Monument and did not recommend that any lands managed by that agency be removed from monument status and protection.

124.   On August 24, 2017, Secretary Zinke submitted his report to the President. The Secretary's report acknowledged that the public comments received were "overwhelmingly in favor of maintaining existing monuments." Nonetheless, as to Bears Ears, the report recommended that the President eliminate portions of the Monument and revoke associated protections for the excised areas. As directed by Executive Order No. 13,792, the Secretary's report stated that it considered extra-statutory factors such as monuments' effects on private land and on extractive uses such as grazing, mining, and timber production in reaching its conclusions.

125.   Based on the Secretary of the Interior's report and recommendations, President Trump indicated his intention to dramatically shrink the Bears Ears National Monument. In October 2017, President Trump reportedly told Senator Hatch: "I'm approving the Bears Ears recommendation for you, Orrin."

126.   On December 4, 2017, President Trump issued a Presidential Proclamation revoking monument status from eighty-five percent of the Bears Ears

38

National Monument and replacing the Monument with two smaller, non-contiguous units that he called "the Indian Creek Unit" and "the Shash Jáa Unit." Although President Trump's proclamation claimed to "modif[y]" Bears Ears, it effectively abolished the Monument and replaced it with two new, much smaller and significantly less protective monuments, separated from one another by roughly twenty miles. Together, the two new "units" cover only fifteen percent of the Bears Ears National Monument's original area.

127.   Even if President Trump's action could fairly be called a "modif[ication]" of the Bears Ears National Monument and not an abolition, the result would be the same: his action revoked monument status and protection from 1,150,860 previously protected acres of land, and significantly weakened the legal protections that apply on the remaining acreage. The President has no constitutional or statutory authority to take such action.

128.   President Trump's proclamation concedes that "[s]ome of the existing monument's objects [of historic or scientific interest], or certain examples of those objects, are not within the monument's revised boundaries," and will therefore be left without monument protections that the 2016 Proclamation deemed necessary and appropriate.

129.   For example, on information and belief, there are numerous areas totaling thousands of acres now excluded from the Monument that the BLM recognizes as having a high potential for cultural and historic sites. These areas— including Farm House Ruin, Tower Ruin, and Fry Canyon Ruin—are now at risk

from damage caused by off-highway vehicles, mining, looting, and vandalism.

President Trump's proclamation asserts that other laws and existing BLM and

Forest Service policies adequately protect these objects, but that is false. For

example, the BLM itself recognized that its pre-Monument travel plan failed to

ensure adequate protection of cultural and paleontological resources, and numerous

public comments emphasized the importance of monument protections for the

effective preservation of such sites.

130.   President Trump's proclamation also excludes from monument

protection areas the 2016 Proclamation deemed "crucial habitat" for elk and bighorn

sheep, with no explanation of how excluding these areas is consistent with the

Antiquities Act. President Trump's proclamation also excludes habitat for the moth

*Eucosma navajoensis* and Utah night lizard, though current agency plans and

policies are inadequate to protect them from harm.

131.   President Trump's proclamation lacks an adequate basis for the

decision to exclude areas with documented scientific or historic values that qualify

for protection under the Antiquities Act.

132.   Because of President Trump's proclamation, the Department of the

Interior will no longer implement the protections required by the 2016 Proclamation

at all for the 1.15 million acres of land removed from the Monument, and will fail to

implement specific protections relating to off-highway vehicles and livestock grazing

on the remaining lands now within the Indian Creek and Shash Jáa units. On

information and belief, Defendants will no longer implement or comply with the

2016 Proclamation unless the Court declares President Trump's action unlawful and sets it aside.

133.   On information and belief, Defendants will promptly revert to their pre-Monument land management approach for the lands stripped of monument protection under the more permissive, pro-development, "multiple use" regime, without the protective mandate of the 2016 Proclamation. President Trump's proclamation will, accordingly, result in significantly less protection of the resources identified in the 2016 Proclamation. Without monument status, Defendants will not protect the scenic, scientific, ecological, historic, and cultural resources on these lands, and, on information and belief, they will reopen lands to uranium mining and oil and gas drilling, with devastating consequences to the wild character and the scientific and cultural resources of the Monument.

**President Trump's action harms Plaintiffs' interests by eliminating protections guaranteed by the 2016 Proclamation**

134.   Each of the Plaintiff organizations has individual members who regularly use and enjoy the Bears Ears National Monument for a variety of purposes, including scientific study, hiking and recreation, wildlife viewing, cultural and spiritual purposes, and aesthetic appreciation.

135.   Plaintiffs' members value the beauty, remoteness, and largely unspoiled nature of the landscape and the geological, paleontological, archaeological, historic, cultural, and ecological resources found throughout the

Bears Ears National Monument, including in the areas that President Trump's proclamation stripped of monument protection.

136.  For example, Lockhart Basin, located in the northern extent of Bears Ears National Monument, is rich in cultural resources, native and unique flora and fauna, and remarkable geology. The area has also been targeted for hardrock mining and oil and gas leasing. Members of Plaintiff organizations, including NRDC, SUWA, Sierra Club, and the Center, frequently visit this place to enjoy its scenic beauty and cultural history. President Trump's proclamation stripped Lockhart Basin of monument status.



*Fig. 2: Lockhart Basin*
*Credit: Ray Bloxham, SUWA*

137.    White Canyon is a maze of incised slickrock canyons located on the western end of the Bears Ears National Monument. It is a popular area for canyoneering and contains a high density of cultural sites, including rock art and structures (e.g. granaries and cliff dwellings) that have survived for hundreds and in some cases thousands of years in the Monument's dry environment. White Canyon also contains tar sands and uranium deposits. Prior to the Monument's designation in 2016, it was often the target of leasing proposals and mining claims. Plaintiffs' members often visit White Canyon for spiritual renewal, to appreciate the cultural sites, and to explore the canyon complex. President Trump's proclamation stripped White Canyon of monument status.



*Fig. 3: White Canyon*
*Credit: Scott Smith*

138.    The Valley of the Gods, located in the extreme southern extent of the Bears Ears National Monument, is one of the most well photographed areas in the Monument and a place of stunning beauty. With its red rock spires and sweeping vistas, the Valley of the Gods offers a unique perspective on the Monument's geology. The Valley of the Gods also contains oil and gas deposits, and notwithstanding its designation as an area of critical environmental concern, it was often subject to oil and gas leasing and development proposals before the Bears Ears National Monument was established in 2016. Plaintiffs' members often visit Valley of the Gods to photograph and study its remarkable geology, as well as for aesthetic appreciation and solitude. President Trump's proclamation stripped the Valley of the Gods of monument status.



*Fig. 4: Valley of the Gods*
*Credit: Louis Salkind*

139.    The Bears Ears National Monument benefited Plaintiffs' members by withdrawing these and other areas from mineral entry and protecting them from the damaging impacts of mining, oil and gas exploration and development, trail and road construction, excessive off-highway vehicle use, artifact theft and destruction, and other harmful activities.

140.    Plaintiffs' members' use and enjoyment of these and other areas within Bears Ears were enhanced by the national monument designation, which conferred important additional protections above and beyond prior management on the areas' fragile resources.

141.    President Trump's action will adversely affect Plaintiffs' members' interests by removing those protections—including the protections against mining, oil and gas exploration and development, road construction, and off-highway vehicle access—from 1.15 million acres of federal public lands that they regularly use, and by allowing activities to commence that will disturb the tranquility and scenic beauty of the area and expose irreplaceable archaeological and cultural sites to a serious and substantially heightened risk of damage.

142.    President Trump's action renders one of the country's most pristine, unique landscapes vulnerable to immediate harm, and thus injures the aesthetic, cultural, spiritual, recreational, scientific, and educational values that Plaintiffs' members derive from the Bears Ears National Monument.

### *Hardrock mining*

143.    For example, because of President Trump's action, the BLM and Forest Service will no longer prohibit mineral entry on the lands that were protected under the 2016 Proclamation and that are now stripped of monument status.

144.    President Trump's proclamation specifies that after sixty days, the 1.15 million acres of land stripped of monument status "shall be open to (1) entry, location, selection, sale, or other disposition under the public land laws and laws applicable to the U.S. Forest Service; (2) disposition under all laws relating to mineral and geothermal leasing; and (3) location, entry, and patent under the mining laws." Thus, after sixty days, these lands will be subject to staking and mining claims under the General Mining Law of 1872.

145.    There are deposits of hard-rock minerals—primarily uranium— throughout the Monument. As recently as September and October 2016, shortly before the designation of Bears Ears National Monument, several new mining claims were located in the Monument.

146.    On information and belief, after the expiration of the sixty-day period, mining claims will imminently be located on federal public lands that were protected under the 2016 Proclamation. In May 2017, representatives from Energy Fuels Corporation—the owner of the Daneros uranium mine in San Juan County, Utah, which sits in close proximity to the Bears Ears National Monument— attended an on-site field trip with Secretary Zinke and presented a map depicting lands then within the Monument that Energy Fuels Corporation proposed be

removed from protection. In July 2017, representatives from Energy Fuels Resources met with Interior Department officials in Washington, D.C., to continue their discussions about Bears Ears. These lands have now been stripped of monument protection under President Trump's proclamation.

147.    Prospectors do not need permits or other prior authorization from the BLM or any other government agency to locate and record hard-rock mining claims on available lands excluded from Monument status. Where valuable minerals are present, these claims constitute valid property interests, creating a persistent cloud on the public land and limiting the federal land managers' ability to preserve the natural character of the land.

148.    Now that President Trump has stripped 1.15 million acres of the Bears Ears National Monument of monument status, prospectors will engage in exploration activities ("casual use" and "notice use" activities) on public lands and mining claims where they previously could not. *See* 43 C.F.R. §§ 3809.10(a), 3809.605(b) (casual use); *id*. §§ 3809.21, 3809.312(a) (notice use).

149.    Notice-level activities may involve road construction, which can generate dust and waste, scrape lasting scars into the soil, remove native vegetation, disturb wildlife habitat, introduce invasive species, increase erosion, and harm water quality. *See id*. § 3809.5 (defining exploration activities). Truck traffic and other surface development results in new auditory and visual intrusions in areas that would otherwise be quiet and pristine. All these impacts harm

Plaintiffs' members' interests and diminish their enjoyment of the natural setting in Bears Ears.

150.   New hard-rock mining claims and exploration are also likely to occur on Forest Service-managed land. *See* 36 C.F.R. § 228.4(a). These new claims and development activities will also harm Plaintiffs' members.

151.   Mineral exploration and development has destructive impacts not only on the claimed land itself, but also on the surrounding area. Increased noise and vehicle traffic threaten Bears Ears' unique character, described in the 2016 Proclamation as "one of the most intact and least roaded areas in the contiguous United States."

152.   In addition to opening up Bears Ears lands to new mineral claims, on information and belief, President Trump's action will also allow development to proceed on existing mining claims that would have been prohibited under the 2016 Proclamation.

153.   There is a substantial risk that these activities will resume as a result of President Trump's proclamation, and that the resumption of these activities will cause imminent harm to the natural, archaeological, and paleontological resources of the Bears Ears National Monument and will thereby harm Plaintiffs' members who visit Bears Ears for quiet recreation, solitude, education, and aesthetic appreciation.

### *Oil and gas leasing*

154.    Additionally, because of President Trump's action, lands that were protected under the 2016 Proclamation are now open for BLM leasing under the Mineral Leasing Act of 1920.

155.    On information and belief, there are oil and gas deposits throughout the Bears Ears National Monument, including in the areas now stripped of monument protection.

156.    Prior to the 2016 Proclamation, the oil and gas industry commonly sought leases and permits to drill on lands within the Monument boundaries, and in many instances the BLM approved the sale of oil and gas leases and applications for permits to drill on those lands. In particular, the BLM sold leases in Hatch Point, near the town of Bluff, and above Fish and Owl Creek—all areas that were included within the Monument under the 2016 Proclamation, but which President Trump has stripped of monument protection.

157.    Absent the Monument's protections, new leaseholders may be authorized to engage in activities with long-lasting impacts—including the scraping of surface vegetation (for drill pads, tanks, and other facilities associated with drilling) and the construction of new roads and pipelines (with the resulting truck traffic, fumes, debris, and other damage)—with few restrictions. These activities threaten to disrupt not only the land on which leases are granted, but also the surrounding areas.

158.   On information and belief, the BLM will now manage the Monument lands that have been stripped of protection pursuant to the resource allocations made in the BLM's pre-Monument resource management plans. Many of the BLM-managed lands that were protected by the 2016 Proclamation are identified in these resource management plans as open for leasing with minimal stipulations.

159.   On information and belief, the BLM will likely lease lands for oil and gas development that would, absent President Trump's order, have been protected by the 2016 Proclamation.

### *Roads and off-highway vehicle use*

160.   In addition, by stripping 1.15 million acres of monument status and purporting to modify the protections that apply to the remaining acreage, President Trump's proclamation makes it substantially more likely that off-highway vehicle traffic will increase and spread into sensitive areas, damaging the landscape and historic and scientific resources and harming Plaintiffs' members' interests.

161.   By designating Bears Ears as a national monument and including it in the National Landscape Conservation System, the 2016 Proclamation required the BLM to more strictly regulate off-highway vehicle use to protect natural, archaeological, cultural, and paleontological resources within the Monument's boundaries. The 2016 Proclamation also specifically prohibited the construction and designation of any new roads or trails except those needed "for the purposes of public safety or protection of [the Monument's] objects," and it specified that use of existing roads or trails already designated for off-highway vehicle use could

continue pending completion of a new travel management plan, but only if such use

was "consistent with the care and management of [the protected] objects."

162.    President Trump's action removes these protections entirely from the

1.15 million acres of land that are stripped of monument status. Those areas will

now revert to the inadequate terms of the BLM and the Forest Service's pre-

Monument travel plans and will suffer harm related to the impacts of inadequately

regulated and increasing off-highway vehicle use.

163.    Inadequately controlled off-highway vehicle traffic destroys a unique

and foundational element of the desert ecosystem: cryptobiotic soil. Loss of this

crucial assemblage of soil bacteria and other components causes ecological damage,

loss of soil fertility, and scars on the landscape that can take hundreds of years to

recover.

164.    Off-highway vehicle use on roads and trails designated in the BLM's

and Forest Service's travel plans has already caused direct and indirect damage to

archaeological and cultural resources throughout the lands designated in the 2016

Proclamation. Reverting to those pre-Monument travel plans will allow such

damage to continue. The revocation of the Monument designation and the removal

of the limitations on off-highway vehicles will put cultural sites and artifacts in

serious jeopardy. The pre-existing resource management plans contain inadequate

protections for those sites and artifacts.

165.    Moreover, within the Indian Creek and Shash Jáa units, President

Trump's proclamation opens roads and trails for motorized vehicle use that would

51

have been closed under the 2016 Proclamation as incompatible with the protection of the Monument's objects of historic and scientific interest. President Trump's proclamation states that, "pending preparation of the transportation plan" for the Indian Creek and Shash Jáa units, "motorized . . . vehicle use" may be allowed on "roads and trails designated for such use immediately before [the 2016 Proclamation]"—thereby leaving open roads and trails that would have been closed under the 2016 Proclamation as inconsistent with the care and management of the protected objects.

166.   President Trump's proclamation also makes it more likely that damage caused by livestock grazing to cultural and historic resources (including culturally important plants), as well as soils and habitats related to objects of scientific interest, will continue on lands protected under the 2016 Proclamation. The 2016 Proclamation mandated that livestock grazing would be evaluated to "ensure . . . the care and management of the objects" identified. The Trump proclamation removes that protection entirely.

167.   The lifting of these protections will subject Plaintiffs' members to the noise and disruption associated with off-highway vehicle traffic, and will facilitate motorized vehicle access to ecologically and culturally fragile areas, thereby contributing to the damage and looting of archaeological sites and harm to the ecosystem.

168.   Because of President Trump's proclamation, BLM and Forest Service lands will be exposed to the kind of widespread off-highway vehicle damage that

occurred prior to the Monument's designation. New roads and trails will be
constructed and designated under these agencies' historically inadequate regulation
of such use. Off-highway vehicle use will increase and spread into new areas
currently not accessed by vehicular traffic. These new roads and trails would not
have been constructed and designated if the 2016 Proclamation were still in effect.

169.    For example, shortly before President Obama issued the 2016
Proclamation, the BLM approved the construction of a new off-highway vehicle trail
and three parking lots in the Indian Creek area, within the original boundaries of
the Monument but outside the so-called "Indian Creek Unit." On March 13, 2017,
the Interior Board of Land Appeals stayed construction of the trail and parking lots,
concluding that "new roads and trails" were prohibited by the 2016 Proclamation,
and that appellants including SUWA, the Grand Canyon Trust, and Great Old
Broads had established that the commencement of construction would cause their
members irreparable harm. *See* Order, *S. Utah Wilderness Alliance et al.*, IBLA
2017-75, *6-7 (Mar. 13, 2017).

170.    Now, given President Trump's action, the basis for the Board's stay of
the trail and parking lot construction has disappeared, opening the door to
increased destructive motorized vehicle use that would not have been allowed under
the 2016 Proclamation.

171.    The revocation of the Monument designation and its limitations on off-
highway vehicles harms Plaintiffs' members' aesthetic, cultural, spiritual,
recreational, scientific, and educational interests because it will lead to increased

noise, air pollution, and other physical damage to the land, water, wildlife habitat, scenery, and cultural resources that Plaintiffs' members wish to enjoy as pristine.

### *Damage to paleontological resources*

172.    President Trump's action also removes protections for paleontological resources in Bears Ears.

173.    While federal regulations generally allow the "casual collecting" of common invertebrate and plant fossils for non-commercial personal use on land managed by the Forest Service, 36 C.F.R. §§ 291.5, 291.10, that same casual collecting is absolutely prohibited in national monuments, *id*. § 291.12. Violations may be punished by a fine or imprisonment. *Id*. § 1.3(b).

174.    The BLM also allows the non-commercial collection of "rock and mineral specimens, common invertebrate and common plant fossils, and semiprecious gemstones." 43 C.F.R. § 8365.1-5(b)(2). The 2016 Proclamation prohibited such collection inside the Monument by giving "warning . . . to all unauthorized persons not . . . remove any feature of the monument."

175.    Due to President Trump's action, casual collection of paleontological resources will no longer be illegal on lands stripped of Monument protection and will likely resume. The collection and appropriation of those resources means that Plaintiffs' members will lose the ability to view them in situ and enjoy their scientific and educational value in their natural setting.

**Agency Defendants have decided not to carry out their duties under the 2016 Proclamation**

176.   Due to President Trump's action, on information and belief, Defendants Secretary of the Interior, Director of the Bureau of Land Management, Secretary of Agriculture, and Chief of the U.S. Forest Service (collectively, the Agency Defendants) have decided not to carry out their duties under the 2016 Proclamation. For example, on information and belief, the Agency Defendants will no longer prepare an off-highway vehicle travel plan for the Monument that protects and restores the objects identified in the 2016 Proclamation, nor will they prepare a monument management plan that spans the full extent of the lands and objects protected by the 2016 Proclamation.

177.   President Trump (by purporting to revoke monument status from the vast majority of the Bears Ears National Monument and override the protections that apply in the remaining parcels under the 2016 Proclamation) and the Agency Defendants (by failing to carry out their duties under the 2016 Proclamation) have deprived Plaintiffs of the benefits of the protections guaranteed by the 2016 Proclamation.

178.   Defendants' actions adversely affect and irreparably injure the Plaintiffs' and their members' interests, and those injuries will continue unless the Court grants the relief Plaintiffs seek.

179.   Plaintiffs' injuries would be redressed by the relief sought here.

180.   Plaintiffs have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
## Antiquities Act, 54 U.S.C. § 320301 *et seq.*
### *(Defendant Trump)*

181.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

182.    Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not exceeded his statutory authority.

183.    The President has the authority to regulate federal public lands only to the limited extent that Congress has delegated that authority to the President.

184.    In issuing his proclamation of December 4, 2017, President Trump exceeded his authority under the Antiquities Act, 54 U.S.C. § 320301 *et seq*. Under the Act, Congress authorized the President to designate federal public lands as national monuments, but not to abolish national monuments in whole or in part.

185.    As a result, President Trump's proclamation revoking monument status from the vast majority of the Bears Ears National Monument exceeded the scope of his authority and is *ultra vires* and unlawful.

## SECOND CLAIM FOR RELIEF
## U.S. Constitution, art. II, and separation-of-powers doctrine
### *(Defendant Trump)*

186.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

187.    Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not unlawfully

intruded on Congress's exclusive power over federal public lands under the Property Clause of the Constitution. U.S. Const. art. IV, § 3, cl. 2.

188.    The President has the authority to regulate such property only to the limited extent that Congress has delegated that authority to the President.

189.    Congress has not delegated to the President any authority to revoke or modify the monument designations of prior Presidents or of Congress.

190.    In issuing his proclamation of December 4, 2017, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power under the Property Clause, in violation of the doctrine of separation of powers.

## THIRD CLAIM FOR RELIEF
### Take Care Clause, U.S. Const. art. II, § 3
#### *(Defendant Trump)*

191.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

192.    The U.S. Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art II, § 3.

193.    The 2016 Proclamation, as a lawful exercise of congressional authority delegated to the President under the Antiquities Act, is a "law" within the meaning of the "take Care" clause. Accordingly, the Constitution requires President Trump to faithfully execute that law.

194.    President Trump must also "take Care" to faithfully execute the Antiquities Act, including its narrow delegation of authority to Presidents to declare national monuments, but not abolish them in whole or in part.

195.    President Trump has violated the "take Care" clause of the U.S. Constitution by attempting to override the 2016 Proclamation and revoke national monument status and protection from 1.15 million acres of the Bears Ears National Monument, which contain objects of historic and scientific interest that the 2016 Proclamation designated for protection under the Antiquities Act.

## FOURTH CLAIM FOR RELIEF
### Antiquities Act, 54 U.S.C. § 320301 *et seq.*
### *(Defendant Trump)*

196.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

197.    Even if President Trump had the authority to abolish the Bears Ears National Monument in whole or in part—which he does not—he could only do so in a manner consistent with the terms and the purpose of the Antiquities Act, and consistent with the proper care of the objects of historic and scientific interest identified in the 2016 Proclamation.

198.    When President Obama issued the 2016 Proclamation designating the Bears Ears National Monument, he described the objects of scientific and historic importance that qualified for protection under the Antiquities Act. He also determined, based on the scale and the location of the objects of scientific and

58

historic interest, that the Monument's boundaries were "the smallest area compatible with the proper care and management of the objects to be protected."

199.    President Trump's proclamation eliminating national monument status and protection from 1.15 million acres of the Monument excludes objects of scientific and historic importance from the protection they enjoyed under the 2016 Proclamation, leaving them vulnerable to the very damage that the 2016 Proclamation sought to avoid.

200.    President Trump's order is based on considerations outside the Antiquities Act and lacks any adequate legal or factual justification.

**FIFTH CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 701 *et seq.***
***(Defendants Secretary of the Interior, Director of the BLM,***
***Secretary of Agriculture, and Chief of the U.S. Forest Service)***

201.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

202.    The Administrative Procedure Act (APA) confers a right of action on any person adversely affected by a final agency action or a failure to act, and it waives the federal government's sovereign immunity. 5 U.S.C. §§ 701-706.

203.    Because President Trump had no lawful authority to abolish, in whole or in part, the Bears Ears National Monument, the Secretaries of the Interior and of Agriculture and their subordinate officers remain subject to the 2016 Proclamation's direction to undertake specific, mandatory duties to protect the special values of the Bears Ears National Monument.

59

204.   Any action by Defendants Secretary of the Interior, Director of the BLM, Secretary of Agriculture, or the Chief of the U.S. Forest Service contrary to the 2016 Proclamation constitutes arbitrary and capricious action not in accordance with the law.

205.   As a result of President Trump's proclamation, Defendants Secretary of the Interior, Director of the BLM, Secretary of Agriculture, and the Chief of the U.S. Forest Service will promptly violate the terms of the 2016 Proclamation by managing the lands excised from the Monument under the pre-Monument, less protective multiple-use regime; and by managing the Indian Creek and Shash Jáa units under a significantly less protective regime than the 2016 Proclamation requires. On information and belief, Defendants have no intention of carrying out their duties under the 2016 Proclamation as long as President Trump's proclamation remains in place.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court:

1.   Declare that President Trump's proclamation of December 4, 2017, is *ultra vires* and exceeds his authority under the Antiquities Act,

2.   Declare that President Trump's proclamation of December 4, 2017, exceeds the scope of his authority under Article II of the U.S. Constitution and violates the separation of powers doctrine and the "take Care" clause;

3.   Issue injunctive relief invalidating President Trump's proclamation of December 4, 2017, and barring its implementation;

4.      Issue injunctive relief against Defendants Secretary of the Interior, Director of the BLM, Secretary of Agriculture, and Chief of the U.S. Forest Service, directing them to carry out the mandatory duties imposed on them in the 2016 Proclamation and enjoining them from carrying out President Trump's unlawful proclamation;

5.      Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412; and

6.      Grant such other relief as the Court deems just and proper.


Dated: December 7, 2017                 Respectfully submitted,

/s/ Sharon Buccino
Sharon Buccino (D.C. Bar No. 432073)
Jacqueline M. Iwata (D.C. Bar No. 1047984)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Tel.: (202) 289-6868
Fax: (415) 795-4799
E-mail: sbuccino@nrdc.org
E-mail: jiwata@nrdc.org

Katherine Desormeau
Ian Fein
Michael E. Wall
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
Tel.: (415) 875-6158
Fax: (415) 795-4799
E-mail: kdesormeau@nrdc.org
E-mail: ifein@nrdc.org
E-mail: mwall@nrdc.org
*Counsel for Natural Resources Defense Council*

*/s/ James Pew*
James Pew (D.C. Bar No. 448830)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, D.C. 20036
Tel.: (202) 667-4500
Fax: (202) 667-2356
Email: jpew@earthjustice.org

Heidi McIntosh (*pro hac vice* pending)
Yuting Yvonne Chi (*pro hac vice* pending)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 623-9466
Fax: (303) 623-8083
E-mail: hmcintosh@earthjustice.org
E-mail: ychi@earthjustice.org
*Counsel for National Parks Conservation
Association; The Wilderness Society; Grand
Canyon Trust; Great Old Broads For
Wilderness; Western Watersheds Project;
Sierra Club; Center for Biological Diversity;
WildEarth Guardians; and Defenders of
Wildlife*

*/s/ Stephen H.M. Bloch*
Stephen H.M. Bloch (*pro hac vice* pending)
Landon C. Newell
Laura E. Peterson
Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
Tel: (801) 486-3161
Fax: (801) 486-4233
E-mail: steve@suwa.org
E-mail: landon@suwa.org
E-mail: laura@suwa.org
*Counsel for Southern Utah Wilderness
Alliance*

62